UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 13-10137 |
| | ) | Chapter 7 |
| JAMES LEE NICKESON | ) | |
| SSN/ITIN xxx-xx-8970 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| FORREST C. ALLRED, TRUSTEE | ) | Adv. No. 14-1004 |
| | ) | |
| Plaintiff | ) | |
| -vs- | ) | |
| | ) | DECISION RE:  COUNTS AGAINST |
| CAMILLE NICKESON; | ) | DEFENDANTS CAMILLE NICKESON |
| LEE NICKESON; | ) | AND JAMES L. NICKESON FARMS, INC. |
| JAMES L. NICKESON FARMS, INC.; | ) | |
| and LLJ, LLP | ) | |
| | ) | |
| Defendants. | ) | |

The matter before the Court is Trustee-Plaintiff Forrest C. Allred's Adversary
Complaint to Set Aside and Recover Fraudulent Transfers, Reverse Pierce the
Corporate Veil, Substantively Consolidate[,] and for Turnover and Injunctive Relief as
it relates to the counts against Defendants Camille Nickeson and James L. Nickeson
Farms, Inc.   The Court enters these findings and conclusions pursuant to
Fed.R.Bankr.P. 7052.  For the reasons discussed below, the Court will enter judgment
in favor of Trustee-Plaintiff Allred on counts I, II, III, IV, VII, and XI, will dismiss with
prejudice count VIII as to Defendant James L. Nickeson Farms, Inc., and will dismiss
counts IX and X without prejudice.

Material Facts.

The transfers that are the subject of the complaint in this adversary proceeding

are the progeny of Debtor James Lee Nickeson's business and personal affairs going back several years.  Many of the material facts were established during the earlier summary judgment proceeding and are set forth below.

James L. Nickeson Farms, Inc. ("Farm Corporation") was incorporated in 2002. Its articles of incorporation authorized it to issue 15,000 shares with a par value of $100.00 per share "fully paid and nonassessable[.]"  Corporate records for Farm Corporation indicate Nickeson Farms, Inc. was a separate corporation that transferred substantial assets to Farm Corporation on June 22, 2002 in exchange for 15,000 shares in Farm Corporation; Nickeson Farms, Inc. then immediately transferred the 15,000 shares in Farm Corporation to James Lee Nickeson ("Debtor") personally for unknown consideration.  Debtor was the lone incorporator and the sole director of Farm Corporation.

Debtor filed a chapter 11 petition in bankruptcy on December 3, 2009, Bankr. No. 09-10263 (D.S.D.).  According to his chapter 11 schedules, his assets were worth $646,300.00, while his liabilities totaled $5,146,441.69.  On his schedule of personal property, Debtor stated he owned 15,000 shares in Farm Corporation with an unknown value, but he did not answer any business-related questions regarding Farm Corporation or any other business entity in his statement of financial affairs or disclose any income paid or owed to him from any business entity.[1]  Debtor did not schedule

---

[1]In his chapter 11 case, Debtor referred to "James L. Nickson [sic] Farms, Inc." on schedule B and "Nickeson Farms, Inc." on schedule H.  Debtor's amendment to schedule H in his chapter 11 case added "James L. Nickeson Farms" as a co-debtor, but did not delete the references on his original schedule H to "Nickeson

any gold,  silver, or art prints.

Debtor's original disclosure statement in his chapter 11 case did not reference his wife Camille Nickeson; she did sign a February 7, 2007 balance sheet for Farm Corporation that Debtor had attached to the original disclosure statement.[2]  His original disclosure statement also did not reference Central Livestock Association Inc. or Genex Cooperative, Inc. (collectively "Genex") as specifically holding a secured or an unsecured claim to be paid through the plan.  Two objections to Debtor's original

_____

Farms, Inc."  In Debtor's chapter 7 case, he included "James L. Nickeson Farms, Inc." on schedule B, "JLN Farms" on schedule D, "JLN Farms, Inc." on schedule H, and "Nickeson Farms," "James L. Nickeson Farms, Inc.," "JLN Farms, Inc.," and "JLN Farms" on his statement of financial affairs.  In Debtor's chapter 7 case, a few documents, including some cancelled checks, indicated Defendant Lee Nickeson, Debtor's son, used "Nickeson Farms" (no "Inc." included) as a business name.  In its summary judgment decision, the Court asked the parties to clarify the record at trial regarding what is "Nickeson Farms," whether Nickeson Farms, Inc. is still active, and if so, who holds the equitable interests in it.  At trial, Debtor testified he and his brother owned the equitable interests in Nickeson Farms, Inc., he had not been a part of Nickeson Farms, Inc. since 2002, and Nickeson Farms, Inc. is no longer an active corporation.  However, the record at trial showed Debtor still listed "Nickeson Farm Inc." as co-owner on a bank account in October 2009.  At trial, Debtor also admitted he still did business using Nickeson Farms, Inc. as late as August 2009 when receiving a line of credit.  The record further showed *both* Debtor and Defendant Lee Nickeson used Nickeson Farms (no "Inc.") as a business name, with Debtor doing so as late as September 2012.  Consequently, the various trails of assets and liabilities winding between and among Debtor, his family members Defendant Camille Nickeson and Defendant Lee Nickeson, Defendant Farm Corporation, Nickeson Farms, Inc., and Nickeson Farms remained difficult to navigate.

[2]The pre-printed form is labeled "Agricultural Balance Sheet" and the inserted name of the "Borrower" is Farm Corporation.  In his original and his amended chapter 11 disclosure statements, Debtor referred to the "Agricultural Balance Sheet" as a financial statement for him and his wife Camille Nickeson and further stated: "Numerous assets on the balance sheet belong to the Debtor's spouse and are not property of the Estate."  Which specific assets Debtor claimed belonged to Camille Nickeson were not identified.

disclosure statement were filed, including one by Genex, which identified itself as holding 80% or more of the unsecured claims in the chapter 11 case. After a hearing, Debtor was ordered to set forth the resolution of the objections in an amended disclosure statement, which the parties in interest were given an opportunity to review before Debtor filed it. Debtor eventually filed the amended disclosure statement, and the Court approved it on December 22, 2010.

In the amended disclosure statement, where claims were described, Debtor added a reference to Genex:

> Class 14 is the partially secured/unsecured claim of Central Livestock Association/Genex Cooperative, Inc. in the amount of $1,717,742.46, plus accrued interest through the date of the commencement of the case. This claim is to be paid pursuant to the Stipulation of the parties as shown in Exhibit H. It is estimated that these creditors are receiving a distribution roughly equal to a present value of $.20 on the dollar.

In another section of the amended disclosure statement entitled "Means for Execution of the Plan," Debtor added:

> The Debtor's spouse intends to sell $100,000 worth of Gold investments she owns. These funds will be paid to James Nickeson Farms. Nickeson Farms will then pay the $220,000 to Genex. James Nickeson Farms will issue stock to Debtor's spouse which will reduce the value of Debtor's stock.

To the amended disclosure statement, Debtor attached the same February 7, 2007 balance sheet for Farm Corporation, which indicated Farm Corporation had a net worth of $5,484,012.00. The balance sheet also stated Farm Corporation owned $65,000.00 worth of gold, $6,500.00 worth of silver, and $120,000.00 worth of art prints and guns. Another attachment to the amended disclosure statement was

Debtor's liquidation analysis.  As had the one attached to Debtor's original disclosure statement, this liquidation analysis did not assign a value to Debtor's interest in Farm Corporation; instead, in the liquidation analysis Debtor enigmatically stated, "[The value of Farm Corporation] is being utilized to generate income to pay unsecured creditors.  A liquidation of Nickeson Farm would result in negative income taxes."

Debtor also attached to the amended disclosure statement a new document entitled "Stipulation for Plan Treatment of the Pre-petition Secured and Unsecured Claims of [Genex]."  In it, Debtor and Genex acknowledged Genex had a judgment against Debtor, R&J Dairy, and Richard Millner for $1,717,742.46 and agreed Genex would be paid a total of $550,000.00 on that debt, with $220,000.00 to be paid by January 15, 2011 and the balance to be paid in annual installments of $30,000.00 for several years.[3]  The stipulation further provided:

> c.  Debtor (and the Debtor's spouse to the extent she asserts any interest in such property) shall grant Genex a security interest/mortgage on all real estate, farming equipment, farm products, claims, accounts receivable, inventory, general intangibles, business tort claims and all other business assets owned by Debtor or in which the Debtor has any interest, including but not limited to any real property or personal property that the Debtor has transferred or attempted to transfer to the Debtor's son or to other family members, which property or personal property, if not currently 100% owned by the Debtor, shall either be returned and transferred to the Debtor, or the Debtor will make arrangements satisfactory to Genex,

---

[3]In trial Exhibit P31(C), the Court located three checks to Genex for $30,000.00 dated January 3, 2012, January 10, 2013, and October 11, 2013.  All were written on Farm Corporation's account.  The Court was unable to locate in the record the check or checks used by Farm Corporation to make the first post-settlement payment to Genex of $220,000.00 or a receipt for an electronic funds transfer for the $220,000.00 payment.

for conveying security interests/mortgages in such property to Genex.

    d.  As a condition of this agreement, the Debtor shall cause Nickeson Farms, Inc. ("Nickeson Farms") to execute a guaranty of the Genex Claim, and shall cause Nickeson Farms to secure such guaranty of the Genex Claim by granting a security interest/mortgage in all of its assets to Genex. Genex agrees to release its lien on farm equipment to the extent reasonably requested by Nickeson Farms, to enable Nickeson Farms to trade such equipment on new equipment in the ordinary course of business.

The stipulation also included certain subordination provisions regarding Genex's new security interests.

Debtor circulated for confirmation the amended disclosure statement and a modified plan. In the modified plan, Debtor stated:

The Debtor will work for James Nickeson Farms, Inc. and James Nickeson Farms, Inc. will guarantee the secured debts if this Plan is confirmed. Farms will transfer sufficient funds to make the payments required under the Plan for Secured Creditors. For the Unsecured Class (Class 15), Farms will guarantee that the Class 15 claimants will be paid the amount they would receive under a Chapter 7, less tax claims and other liquidations costs.

Attached to the modified plan was the above-described stipulation between Debtor and Genex. In the modified plan itself, the Court did not find any other reference to Camille Nickeson. Also, the modified plan referenced Farm Corporation as the guarantor of secured and unsecured claims, while Debtor's stipulation with Genex referenced Nickeson Farms, Inc. as the guarantor of Genex's claim.

According to minutes of a special meeting of Farm Corporation's board of directors dated January 7, 2011, directors Debtor and Camille Nickeson approved an

amendment to Farm Corporation's articles of incorporation.[4]  Under the amendment, Farm Corporation would have authority to issue 75,000 shares, rather than just 15,000.  Each share was to again have a par value of $100.00 "fully paid and nonassignable[.]"  According to the same board meeting minutes dated January 7, 2011, Farm Corporation's by-laws were amended to increase the number of directors from one to two.  The board minutes further provided, "Camille Nickeson stated that she had contributed cash to the corporation in the sum of $133,000.00 in return for the issues [sic] of 60,000 shares of the capital stock of the Corporation."  The board's attendant formal resolution provided Farm Corporation could issue the 60,000 shares to Camille Nickeson upon receipt of the stated consideration.  Shareholder minutes also dated January 7, 2011, signed by both Debtor and Camille Nickeson, accepted the board's change to the articles of incorporation and the change to the by-laws. Debtor continued as Farm Corporation's president and treasurer; Camille Nickeson served as its secretary.  With this planned transfer, Camille Nickeson would own 80% of the available shares in Farm Corporation, and Debtor's interest would drop from 100% to 20%.

---

[4]In the summary judgment decision at footnotes 2 and 4 is an extended discussion of problems regarding shareholder meeting minutes dated December 22, 2006 and July 25, 2009 and board and shareholder meeting minutes dated January 7, 2011 and who was entitled to vote at each meeting.  The errors discussed now appear to be the product of the minutes not being kept contemporaneously with actual meetings, as Camille Nickeson admitted happened, *see infra* p. 23, or with meetings being fabricated and minutes for the fictitious meetings being backdated to when the meetings would have appropriately been held, which seems equally as probable when the entire record is considered.

In an August 22, 2013 state court deposition, Camille Nickeson initially indicated she did not know why Farm Corporation's available shares were increased from 15,000 to 75,000.  In the same deposition, she later stated it was done because "[Debtor] needed to pay Central Genex money that was a, I don't know if it was a lawsuit or what it was, and the corporation couldn't pay it, [Debtor] didn't have the money, so I said I would, but I would have to have extra shares, I would have to be a bigger share in the corporation in order to do that."  She further acknowledged the Genex debt was personal to Debtor, not the corporation.

In a July 29, 2013 state court deposition, Debtor testified the source of the $133,000.00 Camille Nickeson used to purchase the 60,000 shares was an inheritance from her father.  In her August 22, 2013 state court deposition, however, Camille Nickeson said about $81,000.00 of the funds came from three sources–an inheritance, savings, and a loan from Debtor's and her son, Lee Nickeson–and the balance came from gold.  Camille Nickeson stated in her deposition she received the gold from Debtor, who had been collecting gold coins for years.  Camille Nickeson further stated Farm Corporation had carried the gold on its books as an asset, Debtor then gave the gold to her, and she subsequently used the gold to purchase the 60,000 shares from Farm Corporation.  Camille Nickeson acknowledged in her deposition she did not pay for the gold.  In her amended answer in the instant adversary proceeding, Camille Nickeson provided a different scenario:  She said she obtained the funds to purchase the 60,000 shares via two "loans" from Lee Nickeson totaling $79,375.00

"and the remainder of the funds [$53,625.00] came from inheritances…received from her father."  However, in her August 22, 2013 deposition, Camille Nickeson testified the inheritance from her father was only $12,000.00.  Camille Nickeson and Lee Nickeson never produced any documentation evidencing the claimed loans from Lee Nickeson to Camille Nickeson.

Bank records paint another picture.  On January 11, 2011, Camille Nickeson deposited $117,472.00 in her bank account, which resulted in a balance of $135,179.72.  Three checks comprised the deposit:  a check from an insurance company for $38,097.00 dated January 4, 2011 payable to Farm Corporation and Debtor and two checks from Nickeson Farms and Lee Nickeson to Camille Nickeson totaling $79,375.00, one dated January 7, 2011 and another dated January 11, 2011.[5]  Camille Nickeson then wrote a check to Farm Corporation for $133,000.00 on January 12, 2011, and it was deposited in Farm Corporation's account on that day.  Thus, at the time of the summary judgment motion, the record showed about 29% of the $133,000.00 Camille Nickeson transferred to Farm Corporation was already Farm Corporation's funds, and Lee Nickeson and Nickeson Farms, not Camille Nickeson, supplied just over 59% of the $133,000.00.  The source of the $17,707.72 in Camille Nickeson's account, prior to the January 2011 deposits, and the source of the $79,375.00 transferred from Lee Nickeson and Nickeson Farms to Camille Nickeson were unknown.  Of the transactions discussed by Camille Nickeson in her August 22,

---

[5]"Nickeson Farms" (no "Inc." included) and "Lee J. Nickeson" were printed on the checks as the drawers or account holders.  *See supra* note 1*.*

2013 state court deposition, her amended answer in this adversary proceeding, and her bank account records, none matched Debtor's chapter 11 amended disclosure statement, in which Debtor said Camille Nickeson would use $100,000.00 of gold she owned to acquire shares in Farm Corporation.

Only the Internal Revenue Service objected to Debtor's modified plan, and only one unsecured creditor balloted against it. After a hearing, the Court confirmed the modified plan and directed Debtor to file a Plan as Confirmed to incorporate the resolution of the Internal Revenue Service's objection. The confirmation order and the Plan as Confirmed were entered February 7, 2011.

On February 16, 2011, Farm Corporation filed the amendment to its articles of incorporation with the South Dakota Secretary of State. This amendment reflected the board meeting minutes dated January 7, 2011 that stated the board decided to increase the available shares from 15,000 to 75,000.

According to a balance sheet provided to Great Plains Bank, Farm Corporation had a net worth of $851,209.00 on March 24, 2011. Substantial assets that had been on Farm Corporation's February 7, 2007 balance sheet attached to Debtor's amended disclosure statement, notably $65,000.00 worth of gold, $6,500.00 worth of silver, and $120,000.00 worth of art prints and guns, had been removed.[6]

---

[6]Farm Corporation's balance sheet dated January 30, 2008 valued the gold at $90,000.00, the silver at $8,000.00, and the art prints and guns at $120,000.00. The gold and the art prints and guns were described and valued the same on Farm Corporation's March 25, 2009 balance sheet, but the quantity of silver was reduced by four 500 ounce units, and the silver's total value was decreased to $6,000.00. Farm Corporation's balance sheets dated February 23, 2010, March 24, 2011,

On August 26, 2011, Debtor gave a security interest in various assets to Genex, as had been discussed in his plan.  The security agreement's clause setting forth the collateral did not specifically reference Debtor's shares in Farm Corporation.  Instead, it provided:

> [Debtor] hereby grants to [Genex], to secure the payment and performance in full of all of the Obligations, a security interest in the following properties, assets and rights of [Debtor], wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "Collateral"):  all farming equipment and machinery, Farm Products, claims, accounts receivable, inventory, general intangibles,[7] business tort claims, and all other business and agricultural assets owned by [Debtor] or in which [Debtor] has an interest, including [Debtor]'s art collection and gun collection.  Without limitation of the foregoing, the Collateral shall include the claims described on Exhibit 4.5.[8]

In contrast, the U.C.C. Financing Statement filed by Genex on September 22, 2011 did specifically reference Farm Corporation stock as part of the collateral Debtor pledged to Genex.

When Debtor signed this security agreement with Genex, Farm Corporation's "STOCK TRANSFER LEDGER" recognized Debtor as the sole shareholder.  Though the

---

March 12, 2012, March 1, 2013, and April 25, 2014 did not have any gold, silver, or art prints and guns listed.

[7]An interest in a partnership or limited liability company is a "general intangible," as long as it is not publicly traded or held in a securities account.  S.D.C.L. §§ 57A-8-103(c) and 57A-9-102(a)(42); *see Davis v. Brown* (*In re Brown*), 479 B.R. 112, 116-17 (Bankr. D. Kan. 2012).

[8]The Court was unable to locate in the record the "Exhibit 4.5."  A later reference in the August 26, 2011 security agreement indicates Exhibit 4.5 is a list or description of commercial tort claims.

special board meeting minutes dated January 7, 2011 provided Farm Corporation was authorized to issue 60,000 shares to Camille Nickeson "upon receipt by [Farm] Corporation of the consideration set forth [in the stock subscriptions]," as of August 26, 2011, Farm Corporation had not recorded Camille Nickeson as a shareholder or issued a stock certificate to anyone.[9]

As part of Debtor's agreement with Genex, Camille Nickeson signed a document entitled "Consent and Grant to Security Agreement," also dated August 26, 2011.[10]

---

[9]A particular by-law required Farm Corporation's stock certificates to be consecutively numbered. The certificate for the 2,250 shares Debtor retained after he transferred 12,750 shares to Camille Nickeson has number "1" on it, and Camille Nickeson's certificate for her total 72,750 shares has number "2" on it. Thus, it appears Farm Corporation never issued a stock certificate to either Nickeson Farms, Inc. or Debtor for the original 15,000 shares, though the stock transfer ledger reflected their ownership.

[10]In a reply (doc. 107) in reference to the motions for summary judgment, Defendants Camille Nickeson and Farm Corporation alluded to a "pledge agreement" dated August 26, 2011 they wanted the Court to consider in place of the security agreement referenced by both parties. They requested leave to file the pledge agreement as an attachment to an affidavit, but did not explain why they had not referenced this document earlier in the proceeding and included it in the record. Camille Nickeson's "Consent and Grant to Security Agreement," discussed above, was dated August 26, 2011, but it is not clear if it was the "pledge agreement" alluded to by Defendants. During the summary judgment proceeding, Defendants appended to their copy of the security agreement (doc. 87-4) Camille Nickeson's August 26, 2011 "Consent and Grant to Security Agreement" and an extra page that said, "SCHEDULES AND EXHIBITS TO THIS DOCUMENT ARE INTENTIONALLY OMITTED FOR PURPOSES OF THIS MOTION FOR PARTIAL SUMMARY JUDGMENT[.]" What those additional "schedules and exhibits" were, like the alluded to "pledge agreement," was never made clear to the Court. The "Consent and Grant to Security Agreement" was referenced at trial during Trustee Allred's direct examination of Camille Nickeson as part of Plaintiff's Exhibit 58 [it was occasionally misidentified as Plaintiff's Exhibit 68]. During this testimony, Camille Nickeson admitted her representations in the August 26, 2011 "Consent and Grant to Security Agreement" regarding the gold and silver were not true.

The document said Debtor transferred his gold and silver collection to Camille Nickeson, she sold it for cash, and then she "used the cash to pay, at least in part," Debtor's $220,000.00 commitment to Genex.  In the "Consent and Grant to Security Agreement," Camille Nickeson stated she received in return "80% of the outstanding stock" in Farm Corporation.  This statement, like the others discussed above, did not jibe with the transfers in and out of Camille Nickeson's bank account, but was an acknowledgment by Camille Nickeson that her personal funds were not the exclusive source for her obtaining an 80% interest in Farm Corporation.

Debtor also transferred 12,750 of his original 15,000 shares in Farm Corporation to Camille Nickeson for $28,305.00.  During her August 22, 2013 state court deposition Camille Nickeson could not recall details regarding this transfer, though account records indicate Camille Nickeson paid for these shares by two checks, one for $23,305.00 dated October 28, 2011 and cashed December 13, 2011 and a second for $5,000.00 dated November 9, 2011 and cashed November 14, 2011.  The notation on the November check says "advance on stock."  According to Farm Corporation, the value Camille Nickeson paid for the shares was based on its February 23, 2010 balance sheet, though it acknowledged it owns real property valued at $926,410.00 (doc. 83).  The transfer of the 12,750 shares from Debtor to Camille Nickeson was not a specific provision of either Debtor's chapter 11 modified plan or the attached stipulation with Genex.  With this transfer, Camille Nickeson had cumulatively acquired  97% of Farm Corporation's shares, while Debtor retained only

a 3% interest, another significant decrease from his original 100% ownership.

Camille Nickeson had $780.70 in her checking account on October 25, 2011, just before she purchased the 12,750 shares from Debtor. One large deposit was made before she wrote the checks for these shares: A check for $36,368.11 from Riverview, LLP payable to "Jim L[.] Nickeson Farms, Inc[.]" dated October 24, 2011 was deposited in Camille Nickeson's account on October 27, 2011. Additional deposits were made in Camille Nickeson's account before both her checks for the 12,750 shares cleared. A check for $10,890.00 dated November 16, 2011 from Larry Watkins payable to Debtor was deposited in Camille Nickeson's account on November 18, 2011, with Camille Nickeson receiving $890.00 in cash back. A check for $4,800.00 dated November 27, 2011 from Roger and Wanda Larson payable to Debtor was deposited in Camille Nickeson's account on December 2, 2011. Thus, the record prior to trial showed Camille Nickeson did not have an interest in any of the three deposits, and Debtor was already entitled to $15,690.00 of the $28,305.00 Camille Nickeson "paid" for the 12,750 shares from Debtor. Moreover, though the Court was unable to uncover an explanation in the summary judgment record and no worthwhile explanation was offered at trial, Camille Nickeson did not write checks to Debtor for his 12,750 shares: She made both checks payable to Farm Corporation.

Debtor assigned the 12,750 shares to Camille Nickeson by a document dated October 28, 2011. Farm Corporation issued stock certificates dated October 28, 2011, one to Debtor for 2,250 shares and another to Camille Nickeson for 72,750

shares.[11]   The record does not indicate Farm Corporation ever issued a stock certificate to Camille Nickeson in January 2011, when corporate minutes indicate she was authorized to receive the first 60,000 shares upon paying for them.  Thus, only as of documents dated October 28, 2011 did Farm Corporation's records and issued stock certificates acknowledge Camille Nickeson's ownership of shares in Farm Corporation.

Farm Corporation provided another balance sheet to Great Plains Bank dated March 12, 2012.  This balance sheet indicated Farm Corporation had a net worth of $1,129,304.00.

On June 12, 2012, sixteen months after confirmation of a plan, Debtor moved for dismissal of his chapter 11 case, saying, "[Farm Corporation]'s operating creditor will not release funds to make payments to the Debtor's priority and unsecured creditors[,]" and he was thus unable to pay claims.  In the motion, Debtor also stated he was unable to pay the Internal Revenue Service or unsecured creditors because of insufficient income.  No party in interest opposed Debtor's motion, and the Court dismissed the chapter 11 case on July 9, 2012.

On August 27, 2013, Debtor filed a chapter 7 petition in bankruptcy.  Forrest C. Allred, the case trustee, commenced this adversary proceeding against Camille Nickeson, Lee Nickeson, Farm Corporation, and LLJ, LLP, another business entity in

---

[11]These were the first two stock certificates Farm Corporation issued, according to its records (doc. 105-3).  *See supra* note 9.

which Debtor and his family held an ownership interest.[12]  Trustee Allred's complaint

contains eleven counts, several of which are at issue herein because they involve

Defendant Camille Nickeson or Defendant Farm Corporation.  Under count I, Trustee

Allred wants the Court to avoid Debtor's transfer of the 97% interest in Farm

Corporation to Camille Nickeson under 11 U.S.C. § 548(a)(1)(A), alleging the transfer

was made by Debtor with an actual intent to hinder, delay, or defraud creditors.

Under count II, Trustee Allred wants the Court to avoid Debtor's transfer of the 97%

interest in Farm Corporation to Camille Nickeson under 11 U.S.C. § 548(a)(1)(B),

alleging the transfer was made without adequate consideration, *i.e.*, was

constructively fraudulent.  Under count III, Trustee Allred wants the Court to avoid

Debtor's transfer of the 97% interest in Farm Corporation to Camille Nickeson under

11 U.S.C. § 544(b) and S.D.C.L. § 54-8A-4(a)(1), alleging the transfer was made by

Debtor with an actual intent to hinder, delay, or defraud creditors.  Under count IV,

---

[12]During a separate trial on January 20, 2015 regarding the counts against
Defendant Lee Nickeson and Defendant LLJ, LLP, it was established LLJ was a general
partnership, not a limited liability partnership.  At the conclusion of Trustee Allred's
presentation of his case against these two defendants, Trustee Allred and Defendants
Lee Nickeson and LLJ stipulated to the entry of an order (doc. 132) that provided for
the dismissal of counts V, VI, VII, and VIII without prejudice to Trustee Allred's
"possession, as the trustee of the estate for Bankr. No. 13-10137 (D.S.D.), of all
Debtor James Lee Nickeson's interest in Defendant LLJ arising from the LLJ
Partnership Agreement dated March 11, 2008 and the LLJ Partnership Agreement
2009 dated March 15, 2009, and without prejudice to Trustee-Plaintiff Allred's
seeking from Kay Nikolas, the state court appointed receiver for the LLJ partnerships,
a turnover of the bankruptcy estate assets in her possession that she does not deliver
to Trustee-Plaintiff Allred in compliance with 11 U.S.C. § 543(b)(1)."  That order was
amended April 28, 2015 to clarify counts VII and VIII were dismissed only as to
Defendants Lee Nickeson and LLJ (doc. 165).

Trustee Allred wants the Court to avoid Debtor's transfer of the 97% interest in Farm Corporation to Camille Nickeson under 11 U.S.C. § 544(b) and S.D.C.L. § 54-8A-4(a)(2), alleging the transfer was made without adequate consideration, *i.e.*, was constructively fraudulent. In counts VII, VIII, IX, X, and XI, Trustee Allred seeks certain remedies for the alleged fraudulent transfers: in count VII, a recovery under 11 U.S.C. § 550 of the Farm Corporation stock transferred to Camille Nickeson, or its value, on behalf of Debtor's bankruptcy estate; in count VIII, a turnover under 11 U.S.C. §§ 542 and 543 of Debtor's interest in the LLJ partnership, with a parenthetical reference to Farm Corporation; in count IX, a "reverse piercing" of Farm Corporation's corporate veil; in count X, substantive consolidation of the assets of Camille Nickeson and Farm Corporation with Debtor's bankruptcy estate; and in count XI, a restraining order and permanent injunction against Camille Nickeson and Farm Corporation to prevent Farm Corporation from selling, encumbering, or otherwise transferring assets of Farm Corporation. All the defendants eventually answered.

Trustee Allred moved for partial summary judgment (doc. 71), as did Defendants Camille Nickeson and Farm Corporation (doc. 87), all regarding counts I, II, III, and IV. The Court, based on the undisputed material facts set forth above, denied both motions (doc. 112) but greatly narrowed the issues for trial (doc. 111):

> For counts I and III regarding actual fraud, Trustee Allred has satisfied all the elements with the present record. As discussed above, the record shows the two transfers were of an interest Debtor held in property and both transfers were within the applicable reach-back periods. As to Debtor's fraudulent intent, several badges of fraud are readily apparent in the existing record, thus creating a rebuttable presumption of fraud.

[*Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998)]; [*Allred v. Parmley* (*In re Parmley*), Bankr. No. 13-50109, Adv. No. 13-5005, 2013 WL 6577294, at *2-3 (Bankr. D.S.D. Dec. 16, 2013)]. The transfers of Debtor's shares in Farm Corporation were to an insider, Debtor retained actual control of Farm Corporation, Debtor faced financial difficulties at the time of the transfers, his interest in Farm Corporation constituted a major asset, and Camille Nickeson used little, if any, personal funds to pay for the shares she received. Accordingly, Defendants Camille Nickeson and Farm Corporation must go forward at trial and establish some legitimate supervening purpose for the transfers. *Armstrong*, 141 F.3d at 802; *Parmley*, 2013 WL 6577294, at *2; *see Stoebner v. Ritchie Capital Management, L.L.C.* (*In re Polaroid Corp.*), 472 B.R. 22, 34-36 (Bankr. D. Minn. 2012).

As to counts II and IV regarding constructive fraud, the present record, as discussed above, shows the two transfers were of an interest Debtor held in property and both transfers were within the applicable reach-back periods. The present record, also as discussed above, provides sufficient evidence Debtor was insolvent when the transfers were made, and Defendants Camille Nickeson and Farm Corporation have not identified any admissible evidence that shows Debtor was solvent at the relevant times.

The focus at trial as to Trustee Allred's constructive fraud counts will need to be whether the consideration Camille Nickeson gave for her 72,750 shares was "reasonably equivalent" to the shares' actual value at the time of the transfers. Because Farm Corporation is closely held, a variety of factors may come into play when valuing the stock. *See Kaler v. Charles* (*In re Charles*), Bankr. No. 10-31028, Adv. No. 11-7008, 2012 WL 486524, at *9 (Bankr. D.N.D. Feb. 14, 2012). Moreover, since some of the funds Camille Nickeson transferred were not actually hers–her bank account served as a mere conduit for funds owned by others–what consideration she personally gave for the shares may need to be clarified at trial. Trustee Allred bears the burden of proof on the "less than reasonably equivalent value" issue, though upon a *prima facie* showing, the burden of persuasion may shift to Defendants to show otherwise. *See, e.g., Polaroid Corp.*, 472 B.R. at 57 and 57 n.49 (discussing indirect benefit to debtor through third party); *see also Prairie Lakes Health Care Sys. v. Wookey*, 583 N.W.2d 405, 414 n.7 (S.D. 1998).

A two-day trial on the several counts involving Defendant Camille Nickeson and

Defendant Farm Corporation was held.  The matter was taken under advisement after the parties filed written closing arguments.  The Court's findings from the evidence received at trial are incorporated below.

<u>Actual Fraud</u>.

As set forth in the summary judgment decision, the elements Trustee Allred needed to prove, by a preponderance of the evidence, under count I to establish Camille Nickeson's obtaining a 97% ownership interest in Farm Corporation was actually fraudulent under 11 U.S.C. § 548(a)(1)(A) are:  (1) Debtor transferred an interest in his property; (2) within two years before Debtor's August 27, 2013 petition date; and (3) Debtor made the transfer with an actual intent to hinder, delay, or defraud present or future creditors.  *Kaler v. McLaren* (*In re McLaren*), 236 B.R. 882, 888-89 (Bankr. D.N.D. 1999).

> Once a trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent.  *See* [*Acequia, Inc. v. Clinton* (*In re Acequia, Inc*.), 34 F.3d 800, 806 (9th Cir. 1994)]; *In re Bateman*, 646 F.2d 1220, 1223 (8th Cir. 1981).  In such cases, "the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue."  *Acequia*, 34 F.3d at 806.

*Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998).  *See also Stoebner v. Ritchie Capital Management, L.L.C.* (*In re Polaroid Corp.*), 472 B.R. 22, 34-36 (Bankr. D. Minn. 2012).

The elements under count III, wherein Trustee Allred relies on 11 U.S.C. § 544(b) and S.D.C.L. § 54-8A-4(a)(1), are the same as in count I, except the reach-

back period under state law is four years.  S.D.C.L. § 54-8A-9(a).  State law recognizes similar badges of fraud.  S.D.C.L. § 54-8A-4(b); *Nielsen v. Logs Unlimited, Inc.*, 839 N.W.2d 378, 381-82 (S.D. 2013).[13]

As discussed in the summary judgment decision, the undisputed material facts identified through the parties' cross-motions for summary judgment established badges of fraud regarding Debtor's transformation of his sole shareholder interest in Farm Corporation to a 3% shareholder interest for himself and 97% shareholder interest for his wife, Defendant Camille Nickeson:  Debtor was under financial pressure, his interest in Farm Corporation was a major asset, the insider status of stock recipient Camille Nickeson, and the problematic source of the funds Camille Nickeson transferred in exchange for the stock.  Further, Debtor's control of the corporation never changed with the transfer; the evidence at trial reinforced Debtor has continued to control what Farm Corporation does or does not do.  The burden thus shifted to Defendant Camille Nickeson and Defendant Farm Corporation at trial to establish some legitimate supervening purpose for the transfers of the Farm Corporation stock to Camille Nickeson or Defendants had to go forward and rebut the presumption of fraud. Defendants have failed to do so.

There is no bright line test for what constitutes a legitimate supervening

---

[13]As the Court noted in its summary judgment decision, citing *Prairie Lakes Health Care Sys. v. Wookey*, 583 N.W.2d 405, 411-12 (S.D. 1998), under state law, once the badges of fraud establish a presumption of fraud, the burden is not recognized as "shifting"; instead, the presumption of fraud disappears *if* it is rebutted. *See also In re Estate of Dimond,* 759 N.W.2d 534 (S.D. 2008).

purpose. *Stalnaker v. Dennis* (*In re Dennis*), Bankr. No. 10-83290-TLS, Adv. No. 11-8097-TLS, 2012 WL 359872, at *3 (Bankr. D. Neb. Feb. 2, 2012) (citations therein). Instead, the focus is on whether the presumption of fraud has been adequately rebutted by the defendant showing he has not committed the objectionable acts. *Id*. (quoting *Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 Fed. Appx. 924, 2005 WL 1433137, at *4 (Fed. Cir. June 21, 2005) (citing *Shainman v. Shear's of Affton, Inc.*, 387 F.2d 33, 37 (8th Cir. 1967))).

A "legitimate supervening purpose" for Debtor's transferring 97% of the Farm Corporation shares to his wife, Camille Nickeson, cannot be found in the testimony or exhibits presented at trial, whether the focus is on the transfer of stock to Camille Nickeson in exchange for her personal financial contributions, as suggested by case law, or the furtherance of Debtor's chapter 11 plan and his stipulation with Genex, as advanced by Defendants.

The record does not show Camille Nickeson gave up or pledged identifiable personal assets for the Farm Corporation shares or provided any personal assets to secure a loan owed by Debtor or Farm Corporation; thus, a reason for her to control Farm Corporation was never shown. *Compare Kelly v. Armstrong*, 206 F.3d 794, 799 (8th Cir. 2000). Instead, Camille Nickeson was principally a conduit for monies already belonging to Debtor or Farm Corporation. The evidence at trial only exacerbated Debtor and Camille Nickeson's problems regarding the actual source of the funds she used to acquire the shares.

At trial, Camille Nickeson admitted she had falsely stated in her amended answer that she had used $53,625.00 of an inheritance to help purchase the shares: The subject inheritance was only $12,750.00 plus some unspecified "land" checks. She acknowledged all the money she received as an inheritance from her father, including the unspecified land checks, did not total $56,000.00, and all of it, with the possible exception of $1,000.00, was gone by the middle of August 2010, well before Camille Nickeson transferred funds to Farm Corporation for the shares she obtained. Camille Nickeson admitted her testimony regarding the source of the funds for the Farm Corporation stock was untruthful in her August 22, 2013 state court deposition, when she said $91,000.00 came from personal funds, some came from a loan from her son Lee Nickeson, and about $42,000.00 came from the sale of gold.  Her statement at trial that she did not intend to mislead opposing counsel during the deposition was not credible.  Camille Nickeson admitted at trial no gold or silver she owned was used to purchase her ownership interest in Farm Corporation–contrary to her deposition testimony, contrary to what Debtor's chapter 11 amended disclosure statement provided, and contrary to what Camille Nickeson represented in an August 26, 2011 document provided to Genex.  Camille Nickeson herself earlier testified during her deposition that she never purchased any coins from Debtor. Instead, the elusive gold and silver coins have appeared on balance sheets for Debtor, Farm Corporation, and Lee Nickeson over the relevant years, and who actually purchased the coins, when, and with what funds was never established.  A coin sales

record produced by Trustee Allred at trial showed Debtor, not Camille Nickeson, sold gold coins on September 20, 2011 for $151,494.00.[14]

Camille Nickeson admitted backdating two checks that were used to fund her "purchase" of Debtor's 17% interest in Farm Corporation to correspond with the date the certificates were issued on the corporate books, and she acknowledged she, Debtor, or their attorneys also backdated the corporate records in December 2011 to indicate the stock transfers took place in October 2011. Camille Nickeson was unconvincing when she said the backdated corporate documents just reflected what had actually happened in October 2011.

Finally, there is no documentary evidence showing any funds Lee Nickeson transferred to Camille Nickeson were a loan. In fact, nothing in the record established Camille Nickeson had any personal income in the subject years other than the inheritance from her father, which she admitted was all gone, save at most $1,000.00, by the middle of August 2010.

That Debtor or Farm Corporation could have paid Genex directly–without using Camille Nickeson or Lee Nickeson as conduits for funds and without giving Camille

---

[14]Camille Nickeson testified gold proceeds were used to purchase cattle claimed as hers. The trial record showed Camille Nickeson received in a bank account $129,760.00 from Heartbrand Beef, Inc. on December 20, 2013, and she transferred $30,000.00 from that account to a daughter and the daughter's husband on February 18, 2014. Camille Nickeson testified Heartbrand Beef gave her this large sum of money for cattle she had sold to it. Her testimony that she owned cattle she had originally purchased with proceeds from the sale of her gold was not credible. There has been no reliable documentary evidence Camille Nickeson ever purchased and owned gold or silver or that she purchased cattle using personal funds.

Nickeson an ownership interest in Farm Corporation—is more readily apparent from the record.  Trustee Allred established Debtor deliberately disassociated himself from LLJ before filing his chapter 11 petition and did not account for his profits from or partnership interest in LLJ as part of his assets or as a potential source of income. Trustee Allred established Debtor, just before filing his chapter 11 petition, took funds from two lines of credit—one personal and one jointly in his name and in Nickeson Farms, Inc.'s name—and made cash deposits in Farm Corporation's account.  Trustee Allred also established substantial funds belonging to Farm Corporation or LLJ were re-directed to other accounts, often personal accounts held by Debtor and Camille Nickeson or their children.  Debtor also admitted he personally owned land in North Dakota but chose not to sell it, pay the mortgagee, and pay the balance of the proceeds to Genex.  In fact, as noted above, the record indicates Debtor still had gold on September 20, 2011 when he sold it and used the proceeds to purchase cattle.

While Debtor testified he could not access his share of LLJ profits or other personal funds to make the Genex plan payment, the record did not validate his statements.  The record instead showed Debtor did not disclose his interest in LLJ or the potential profits owed to him by LLJ in his schedules, his statement of financial affairs, or his disclosure statements and proposed plan.  The record further showed Lee Nickeson's net worth rose precipitously from February 2009 to March 2010—$202,451.00 to $1,007,767.00—with large increases noted for pre-paid expenses, gold, and farm machinery, though Lee Nickeson did not show any new

sources of *personal income* to purchase machinery or gold and there was no corresponding *personal debt* reflecting his purchase of additional machinery on credit. Lee Nickeson also received deposits totaling $94,900.00 for crop insurance proceeds and another deposit of $238,908.68 that he reluctantly agreed was most likely grain sale proceeds. However, during this time (2009 crop year) Lee Nickeson personally had not grown any crops, his father was filing a personal bankruptcy, and Farm Corporation's reported net worth dropped by more than $4,000,000.00.

Debtor, Camille Nickeson, Lee Nickeson, and Farm Corporation also opened, used, and closed numerous personal and business bank accounts. They deposited funds in various accounts or transferred funds from one account to another with no cognizable regard for which person or business entity was actually entitled to the funds. They spent the funds for both personal and business reasons as orchestrated by Debtor, not based on which person or entity was responsible for the particular expense. That not all funds were misdirected or that many deposits and transfers were legitimate does not excuse or sanction the numerous deposits and transfers that were not.

Finally, discerning who purchased, who was paying for, and who acquired title to various assets was problematic, again clouding the picture of Debtor's and Farm Corporation's financial ability to directly pay Genex. In addition to the gold and silver coins discussed elsewhere, two examples presented at trial included a Salford finisher and a combine. Debtor listed a $60,000.00 unsecured debt for the Salford in his

chapter 11 case but did not list the Salford as an asset.  At trial, Debtor first testified Farm Corporation bought the Salford and LLJ paid Farm Corporation rent to use it. Then Debtor stated LLJ made the first year's payment for the Salford and Farm Corporation guaranteed the debt.  Then Debtor again said Farm Corporation bought the Salford and LLJ "rented" it from Farm Corporation, though whether LLJ still made the first year's payment was not clear.   Similarly, sometime before 2013, Farm Corporation provided the down payment for a combine, but Lee Nickeson ended up listed as the owner.  In his chapter 11 case, Debtor projected as part of his annual income $102,161.00 from "Machinery Rent," though he stated in his schedules and in the liquidation analysis attached to his amended disclosure statement he owned only four pieces of farming equipment worth $152,500.00.  In sum, the truth of the ownership and payment responsibility for machinery, whether as the borrower or a guarantor, remained difficult to pin down, and the date and terms of any rental agreements for machinery between and among Debtor, Farm Corporation, and LLJ were never provided.

The record sufficiently establishes Debtor's and Defendant Camille Nickeson's financial chicanery during Debtor's chapter 11 case and the time between his two bankruptcy cases.   These actions resulted in Debtor's and Farm Corporation's incoming funds too often being misdirected or circuitously applied to debts they or someone else owed.  And many of these actions can only be characterized as intended to deflate Debtor's personal financial picture, improve Farm Corporation's or Lee

Nickeson's financial stature, and create a guise for insider Camille Nickeson to be given a majority interest in Farm Corporation in exchange for personal financial assistance she gave Debtor and Farm Corporation regarding the Genex debt.  The Court was, however, unable to find in the record any indication Camille Nickeson made an actual personal financial contribution to either Debtor or Farm Corporation.

Fostering the terms of Debtor's confirmed plan also does not constitute a legitimate supervening purpose for Debtor's transfer of his 80% interest in Farm Corporation to Camille Nickeson.[15]  As noted above, Debtor's approved amended disclosure statement provided:

> The Debtor's spouse intends to sell $100,000 worth of Gold investments she owns.  These funds will be paid to James Nickeson Farms.  Nickeson Farms will then pay the $220,000 to Genex.  James Nickeson Farms will issue stock to Debtor's spouse which will reduce the value of Debtor's stock.

Debtor's confirmed plan referenced Camille Nickeson only as Debtor's spouse, saying she would grant Genex a security interest in any assets in which she and Debtor jointly claimed an interest.

Even if the reference to Camille Nickeson in the amended disclosure statement could be considered part of Debtor's confirmed chapter 11 plan, the record does not show Camille Nickeson ever owned any gold coins she could sell to raise funds to pay Genex.  Thus, Debtor and Camille Nickeson could not and did not comply with the

---

[15]Camille Nickeson admitted furthering Debtor's chapter 11 plan and paying Genex were never the motivation for Debtor's transfer to her of his 17% interest in Farm Corporation.

amended disclosure statement term.

Finally, it is imperative to note the futility of Defendants' offer of either Camille Nickeson's efforts to protect herself financially or Debtor and Camille Nickeson's interest in furthering Debtor's chapter 11 plan as a legitimate supervening purpose for the transfer of Debtor's ownership interest in Farm Corporation to Camille Nickeson, when so little of their testimony could be discerned as complete and truthful, when their and Farm Corporation's financial records reflected little legitimacy, and when Farm Corporation's corporate records were not kept contemporaneously. Debtor and Camille Nickeson's explanations for numerous transactions regarding their personal and business accounts and the income and expenses of Farm Corporation and LLJ remained inconsistent and incomplete at trial. Their disregard for corporate formalities pre-petition was extensive and has continued post-petition, with Debtor still diverting significant Farm Corporation income in his personal account and with Debtor taking income generated by assets reported by him as belonging to LLJ or Farm Corporation.[16]

---

[16]Documents in Trustee Allred's exhibit P31 reflect some problematic deposits or fund transfers involving Debtor, Camille Nickeson, Nickeson Farms, and Farm Corporation, with some funds being deposited in an account other than the payee's and some deposits reflecting grain and livestock sales by Debtor himself when he did not schedule any grain or livestock in either bankruptcy case. Some were post-petition. The exhibit also raised concerns regarding rental income. In his chapter 11 case, Debtor scheduled three parcels of realty, one with 40 acres and two with 160 acres each. Debtor amended his schedule G in his chapter 11 case to state son Lee Nickeson rented 291 acres of farmland, and Debtor's confirmed plan included the assumption of a "Farm Lease with Lee Nickeson." The specific real property belonging to Debtor that was involved in this lease and the lease terms were not stated in either the amendment to schedule G or the plan. Further clouding the matter, Debtor

Debtor also admitted his schedules and statement of financial affairs in both bankruptcy cases were materially incomplete, inasmuch as he failed to schedule in either his chapter 11 case or his chapter 7 case his interest in the LLJ partnership and failed to schedule in his chapter 7 case the pending state court litigation regarding the windup of the LLJ partnership.  Debtor and Camille Nickeson each admitted they had previously been untruthful–in pleadings and testimony–regarding Camille Nickeson's inheritance, both as to the amount and how it was spent, and regarding the ownership and disposition of the gold coins.  That their untruthfulness continued in this adversary proceeding, including in their summary judgment pleadings, is not just reproachable, but provided no foundation for the Court to accept as truthful any self-serving testimony from them at trial.[17]

---

attached to his chapter 11 amended disclosure statement three documents with incomplete information regarding rental income:  a "Source of Funds" statement saying he will "receive cash rent from his real estate which will be utilized in the Plan"; personal cash flow statements for the 2010 through 2015 "Production Year[s]" indicating Debtor would receive annual rent of $14,550.00 for 291 acres (lessee not stated); and a 2009 profit and loss statement for Farm Corporation indicating it would receive or had received rental income from Lee Nickeson of $50,000.00 (object of lease not stated).  That rental income was not in Farm Corporation's 2010 profit and loss statement, which was also attached to Debtor's amended disclosure statement. In his chapter 7 case, Debtor scheduled the same three parcels of realty.  He did not schedule any executory contracts or unexpired leases.   Exhibit P31, however, indicated Debtor received $10,660.14 from Joseph G. Schumacher for "Pasture Rent," and he  deposited the funds in his personal account on December 9, 2013 (post-petition).

[17]The reliability of Debtor's testimony was further hampered by his inability to recall reasons for certain large transfers of cash or other dispositions of assets and his fumbling through exhibits when examined by Trustee Allred's counsel, though he did not often have such problems when questioned by Defendants' counsel.

In sum, Trustee Allred established Debtor, Camille Nickeson, and Farm Corporation made no discernable effort to keep separate the income and expenses belonging to Debtor, LLJ, or Farm Corporation. Instead, Debtor's first bankruptcy case was a nearly impossible tangle of his and Farm Corporation's assets and liabilities, with no effort made by Debtor or his creditors to straighten out the mess before confirmation of a plan; deposits were made in incorrect accounts; the purchase, obtaining credit for, and ownership of cattle and equipment and the use of equipment were inexplicably attributed among Debtor personally and his business entities; and crop inputs and their cost and harvested crops and their proceeds were accounted for with little legitimacy or clarity, as was also true with livestock.[18] The Court was left with the singular impression Debtor used his, Camille Nickeson's, Lee Nickeson's, Farm Corporation's, and LLJ's balance sheets and bank accounts to push cash and other assets to and fro as Debtor dictated, with the primary goals of fostering his and his family's personal wealth, keeping creditors away from Farm Corporation, and avoiding or delaying the payment of his and his business entities' liabilities for as long as possible.

Defendants Camille Nickeson and Farm Corporation produced nothing material and reliable that established a legitimate supervening purpose for Debtor's pre-petition transfer of nearly all his ownership interest in Farm Corporation to Camille Nickeson.

---

[18]There was some testimony the LLJ partners, including Debtor, may have made a fraudulent crop insurance claim regarding crop year 2008, but the record was insufficient for the Court to ascertain who was involved and exactly what happened.

All the badges of fraud apparent during the summary judgment proceeding remained and increased in number during the trial; none were rebutted. Debtor's transfer of his majority ownership interest in Farm Corporation to Camille Nickeson was clearly fraudulent under 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 544(b) and S.D.C.L. § 54-8A-4(a)(1).

Constructive Fraud.

The elements Trustee Allred must prove, by a preponderance of the evidence, under count II to establish Camille Nickeson's obtaining a 97% ownership interest in Farm Corporation was constructively fraudulent under 11 U.S.C. § 548(a)(1)(B) are: (1) an interest of Debtor in property; (2) was voluntarily or involuntarily transferred; (3) within two years of August 27, 2013; (4) Debtor received less than reasonably equivalent value; and (5) Debtor was insolvent at the time of the transfer or became insolvent as a result thereof. *Sullivan v. Welsh* (*In re Lumbar*), 457 B.R. 748, 753 (B.A.P. 8th Cir. 2011). The elements Trustee Allred must prove under count IV, wherein he relies on 11 U.S.C. § 544(b)[19] and S.D.C.L. § 54-8A-4(a)(2), are the same as in count II, except the reach-back period under state law is four years. S.D.C.L. § 54-8A-9(b).

Through their motion for partial summary judgment, their response to Trustee

---

[19]At the close of Trustee Allred's case at trial, Defendants moved for judgment on partial findings or dismissal, arguing Trustee Allred had not identified, as required by § 544(b), the requisite predicate creditor. The Court denied the motion as untimely, since it was not made before the dispositive motion deadline. Had the issue been raised timely, however, nothing in the record suggests such a creditor did not exist.

Allred's motion, and attendant affidavits and exhibits, Defendants Camille Nickeson and Farm Corporation established a material factual dispute regarding only one element:  the Farm Corporation stock's actual value when the transfers were made, something Farm Corporation's balance sheet seemingly did not fully reflect.  That value, once established, would then determine whether the stock was fully encumbered and not subject to recovery as a constructively fraudulent transfer, Defendants' initial legal position.  It would also allow a determination of whether the compensation Camille Nickeson transferred for the stock was of a reasonably equivalent value.

As the Court noted in its summary judgment decision, the summary judgment record did not show Genex's security interest attached to the Farm Corporation shares, and even if Genex's security interest had attached to Debtor's Farm Corporation shares, the record did not demonstrate the shares were fully encumbered. *Nielsen v. Logs Unlimited, Inc.*, 839 N.W.2d 378, 384 (S.D. 2013).  That record was not made at trial either, so Defendants' earlier argument that the Farm Corporation stock transferred by Debtor to Camille Nickeson was fully encumbered became a nonissue.  Instead, at trial and in their post-trial briefs, the parties focused on the net worth of Farm Corporation.

The evidence each side presented regarding Farm Corporation's net worth had some problems.  While Trustee Allred focused on the value of Farm Corporation's real property, he did not present a formal appraisal of either the real property or the stock

itself.  Defendants, using the 2011 Farm Corporation balance sheet as their starting point, chipped away at the listed assets, claiming several were owned personally by Nickeson family members, and heaped on additional liabilities, using proofs of claim filed in Debtor's prior chapter 11 case as evidence of claims against Farm Corporation, which often did list Farm Corporation rather than Debtor as the debtor, though it was Debtor's personal bankruptcy case.  Debtor's testimony regarding the value of Farm Corporation's real property and who owned what other assets flip-flopped:  If Trustee Allred's counsel questioned him about these matters, he agreed with that attorney; if Defendants' counsel questioned him about these matters, he agreed with that attorney.

Since no direct evidence of the value of the stock itself was presented–including a valuation of Farm Corporation as a going concern–the only value issue, as framed by the parties, was whether Farm Corporation had a positive net worth in excess of what Camille Nickeson paid for a 97% ownership interest, when Debtor divested himself of majority ownership of Farm Corporation.  After considering the evidence presented, the Court concludes the appropriate time to make this valuation is when the 97% ownership interest in Farm Corporation was actually transferred by Debtor to Camille Nickeson, which trial testimony indicated was around December 2011, when the stock certificates given to Camille Nickeson were backdated to October 2011.

Farm Corporation's balance sheet dated March 12, 2012[20] is the most contemporaneous financial information relative to the December 2011 stock transfer date. The March 12, 2012 balance sheet was represented by the corporate officers to be "true and accurate[.]" A loan officer for the bank receiving the balance sheet deemed the balance sheet to be of "good" quality. This balance sheet reflects the 2011 crops, which would have been harvested and either sold or stored by December 2011. It would also reflect any 2011 calf crop and any proceeds from livestock sales in 2011.

The March 12, 2012 balance sheet showed Farm Corporation had a net worth of $1,129,304.00, which the bank officer verified. The bank officer further noted Farm Corporation's real property actually had an estimated market value of $1,570.00 per acre, which was 40% higher than the $1,119.00 per acre listed on the balance sheet. Debtor's reluctant testimony that land prices were starting to rise at that time supported the bank officer's higher land valuation. Thus, based on the March 12, 2012 balance sheet and the bank officer's and Debtor's testimony, the Court finds Farm Corporation had an approximate net worth of $1,500,000.00 in December 2011, when Camille Nickeson received her 97% ownership interest in Farm Corporation.

Contrary to Defendant Camille Nickeson and Defendant Farm Corporation's assertions, there is an insufficient record to increase Farm Corporation's liabilities at that time. Any lawsuits in which Farm Corporation itself may have been involved at

---

[20]This balance sheet has a typed-in date at the top of March 13, 2012, but Debtor and Camille Nickeson's signatures on it are dated March 12, 2012.

that time were not adequately identified and valued based on the issues being tried and the probability of a judgment for or against Farm Corporation.

There is a sufficient record, however, to add assets to the March 12, 2012 balance sheet. In Debtor's chapter 11 case, when the February 7, 2007 balance sheet for Farm Corporation and the personal liquidation analysis for Debtor attached to Debtor's amended disclosure statement are compared, Debtor declared Farm Corporation, not himself, to be the owner of the gold, silver, art prints, and guns, with a total value of $191,500.00. Debtor cannot now claim to the contrary. *Hutterville Hutterian Brethren, Inc. v. Sveen*, 776 F.3d 547, 556-57 (8th Cir. 2015) (discussing doctrine of judicial estoppel). The record shows only the gold–assuming it was the same lot–was sold before the March 12, 2012 balance sheet was composed. Thus, another $126,500.00 must be added to Farm Corporation's value for the silver, art prints, and guns. That brings the approximate total net worth of Farm Corporation in December 2011 to $1,626,500.00.[21]

Ninety-seven percent of Farm Corporation's net worth in December 2011 was $1,577,705.00, which obviously was much greater than the, at most, $1,000.00 Camille Nickeson paid for a 97% ownership interest in Farm Corporation. Thus, Trustee Allred has proven by a preponderance of the evidence the necessary elements to establish constructive fraud.

---

[21]The Court is not deciding net worth is the best method of valuing the Farm Corporation stock, but is instead using the valuation method espoused by the parties in this adversary proceeding.

<u>Recovery for the Estate</u>.

Under count VII of his complaint, Trustee Allred asserted 11 U.S.C. § 550 permits him to recover, for the benefit of Debtor's bankruptcy estate, the shares of Farm Corporation Debtor transferred to Camille Nickeson.   Defendants Camille Nickeson and Farm Corporation offered a general denial of the trustee's allegations in their answer.   No factual or legal issues regarding § 550 were raised at trial.   In their post-trial brief, Defendants Camille Nickeson and Farm Corporation did not submit any argument regarding § 550.   Accordingly, the order entered with this decision and the judgment entered in this adversary proceeding will, for the benefit of Debtor's bankruptcy estate pursuant to § 550(a), direct the recovery by Trustee Allred of the voided transfer of Debtor's 97% ownership interest in Farm Corporation to Camille Nickeson.

<u>Injunctive Relief</u>.

Under count XI of his complaint, Trustee Allred sought an order enjoining

[Farm Corporation] and its agents, servants, employees, representatives, directors, officers, shareholders and those in concert or participation with them, from directly or indirectly taking any action to sell, transfer or encumber the land (including the real property legally described in Exhibit A hereto) or other assets owned by [Farm Corporation].[22]

However, much like Trustee Allred's requested relief under § 550, Defendants Camille Nickeson and Farm Corporation have not argued against any injunctive relief.

---

[22]The record does not show Trustee Allred took the procedural steps necessary under Fed.R.Bankr.P. 7065 and Fed.R.Civ.P. 65, excluding 65(c), to obtain a temporary restraining order or a preliminary injunction while this adversary proceeding was being litigated.

Regarding count XI, Camille Nickeson and Farm Corporation offered only a general denial in their amended answer.  No factual or legal issues regarding injunctive relief under Fed.R.Civ.P. 65 were raised at trial.  In their post-trial brief, Camille Nickeson and Farm Corporation did not submit any argument regarding injunctive relief.  Accordingly, the order and the judgment entered with this decision will enjoin Camille Nickeson and her agents, servants, employees, or representatives, Farm Corporation and its agents, servants, employees, representatives, directors, officers, and shareholders, and those in concert or participation with these defendants from directly or indirectly taking any action to sell, transfer, or encumber the land, including the real property legally described in Exhibit A to Trustee Allred's complaint, or other assets owned by Farm Corporation.  The order and judgment will also direct Camille Nickeson and Farm Corporation to fully cooperate with Trustee Allred in the transfer of the subject 97% ownership interest in Farm Corporation to Trustee Allred.

<u>Substantive Consolidation or Reverse Piercing of the Corporate Veil</u>.

With the avoidance of Debtor's transfer of 97% of his ownership interest in Farm Corporation to Camille Nickeson and with none of the remaining 3% having been claimed exempt by Debtor, Trustee Allred will wear the shoes of the sole shareholder of Farm Corporation.  In those shoes, he can untangle the knots regarding the ownership of various assets and decide what to do with the corporation itself, including whether to extinguish the corporate entity or place Farm Corporation in its own bankruptcy case.  If Farm Corporation is placed in bankruptcy, either the trustee

of Farm Corporation's case or Trustee Allred in Debtor James Lee Nickeson's case may move for substantive consolidation of the two bankruptcy estates under Fed.R.Bankr.P. 1015(b) and (c). Before substantive consolidation would be ordered, Farm Corporation's and Debtor James Lee Nickeson's creditors would be afforded notice and an opportunity to object, which is preferable to any reverse piercing of the corporate veil or substantive consolidation through this adversary proceeding. *See Reider v. F.D.I.C.* (*In re Reider*), 31 F.3d 1102, 1108 (11th Cir. 1994), *quoted in Boellner v. Dowden*, No. 14-2816, 2015 WL 2193045, at *2 (8th Cir. May 12, 2015); *First Nat'l Bank of El Dorado v. Giller* (*In re Giller*), 962 F.2d 796, 799 (8th Cir. 1992); *WestLB AG v. Kelley*, 514 B.R. 287 (D. Minn. 2014). Accordingly, counts IX and X of Trustee Allred's complaint will be dismissed without prejudice.

<u>Dismissal of Count VIII Regarding Turnover of LLJ.</u>

Trustee Allred's complaint at count VIII references Defendant Farm Corporation in a parenthetical in the title of the count. The Court was unable, however, to find any specific turnover allegations regarding Farm Corporation in the count. Trustee Allred did not discuss this count during the trial or in his post-trial brief. Accordingly, count VIII will be dismissed with prejudice as to Defendant Farm Corporation.

An order and a judgment reflecting this decision will be entered.

Dated: May 28, 2015.

BY THE COURT:

Charles L. Nail, Jr.
Bankruptcy Judge

**NOTICE OF ENTRY**
Under Fed.R.Bankr.P. 9022(a)

This order/judgment was entered
on the date shown above.

Frederick M. Entwistle
Clerk, U.S. Bankruptcy Court
District of South Dakota